# NEW JERSEY STATE BOARD OF MEDIATION

xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
)
In the Matter of the Arbitration Between )
)
UTILITY SYSTEMS, INC. )
) **OPINION**
**EMPLOYER/RESPONDENT** )
) **AND**
AND )
) **AWARD**
INTERNATIONAL UNION OF OPERATING )
ENGINEERS, LOCAL 825, )
)
**UNION/PETITIONER** )
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx)

CASE NO.                  18-0301

ARBITRATOR:         GERARD G. RESTAINO, MUTUALLY CHOSEN BY THE
                    PARTIES PURSUANT TO THE PROCEDURES
                    OF THE NEW JERSEY STATE BOARD OF MEDIATION

APPEARANCES:

        <u>FOR THE EMPLOYER/RESPONDENT</u>
        RONALD TOBIA, ESQ.                 COUNSEL FOR EMPLOYER
        OTHIAMBA LOVELACE, ESQ.            COUNSEL FOR EMPLOYER
        BENEDITTA BARROS                   PRINCIPAL UTILITY SYSTEMS
        NICHOLAS PINHO                     PRINCIPAL UTILITY SYSTEMS
        FRANK PINHO                        PRINCIPAL UTILITY SYSTEMS


        <u>FOR THE UNION</u>
        LAUREN BONAGURO, ESQ.              COUNSEL FOR UNION
        RICHARD F.X. REGAN, ESQ.           COUNSEL FOR UNION
        KEVIN YOUNG                        BA LOCAL 825

**PROCEDURAL BACKGROUND**

The parties in this dispute are signatories to a Collective Bargaining Agreement (CBA) dated April 1, 2014, through March 31, 2017 (see Exhibit U1-A) and as amended April 1, 2017, through March 31, 2020 (see Exhibit U2-A). The grievance filed by International Union of Operating Engineers Local 825, hereinafter referred to as the Union/Petitioner, alleges that Utility Systems, Inc., hereinafter referred to as the Employer/Respondent, violated the terms of the Agreement for the 2017 Milling and Resurfacing Program for the Township of Woodbridge (see Exhibit U-6), 2016 Milling and Resurfacing Knopf Street, Lafayette Street, City of Linden (see Exhibit U7-A), Hiring Hall violation 2016 Milling and Resurfacing Knopf Street, Lafayette Street, City of Linden (see Exhibit U7-B), Hiring Hall violation 2018 Roads and Sewer Improvement Project, City of Woodbridge (see Exhibit U7-C).

The grievance was timely processed through the grievance procedure, and a request was made to the New Jersey State Board of Mediation (NJSBM) to submit a panel of arbitrators.  On December 4, 2018, the undersigned was appointed arbitrator.

Hearings were held on September 24, November 5, 6, 2019 at the offices of the Union located at 65 Springfield Avenue, Springfield, New Jersey.  At the hearings each party had a full and complete opportunity to present evidence and testimony on their behalf, to examine and cross-examine witnesses under oath, and to argue their respective positions.  Capable, competent counsel

represented each party and both parties elected to submit post-hearing briefs and reply briefs. The hearing was officially closed on June 1, 2020.

There were a series of motions made to either postpone and/or delay the hearing as set forth below:

On September 23, 2019, the Respondent submitted a Motion in Federal District Court arguing that the parties must immediately participate in a tri-partite arbitration case involving the Plaintiffs (Local 825 Operating Engineers) and Local 15024 of the Steelworkers.

On October 16, 2019, Ronald Tobia, counsel for the Respondent, submitted an email request Lauren Bonaguro and Richard F.X. Reagan, counsel for the Plaintiffs, requesting that the arbitration scheduled for November 5 and 6, 2019, be postponed because the Federal District Court will be hearing the Motion to Compel Tri-Partite Arbitration on November 4, 2019.  On that same day, the undersigned sent an email to all counsel indicating that the request to adjourn the hearing dates has been denied.

On October 17, 2019, Mr. Tobia submitted a letter to the Arbitrator, with copies to counsel for the Plaintiff, respectfully requesting that the Arbitrator reconsider his recent denial of a request for a postponement of the arbitration currently scheduled for November 5.

On October 19, 2019, the undersigned denied the request for reconsideration.

On February 6, 2020, Mr. Tobia submitted a letter via email to the Arbitrator and counsel for the Respondent requesting the opportunity to reopen

2

the hearing because he wanted to call Frank Pinho and Dita Barros, owners of the Company, as well as Business Representatives who visited the jobs of the Respondent, and who administered the CBA.  He alleges that the rebuttal testimony is essential to clarify the testimony of two prior witnesses, Business Agents Joe Scarpone and James Stevens.

On February 17, 2020, the Arbitrator submitted a letter to the parties stating, *"Counsel for the Respondent made a conscious decision to participate in settlement discussions, but nevertheless, those settlement discussions fell off the rails.  We as professionals must be held accountable for our actions or our lack thereof.  Both parties had ample opportunity to present their cases-in-chief and to prolong this matter is anathema to the arbitration process.*

*Accordingly, the Respondent's Motion to reopen this matter for clarification and/or rebuttal testimony is denied."*

The record reflects that on February 7, 2020, counsel for the Plaintiff submitted a five-page document challenging the reopening of the hearing.

On May 1, 2020, counsel for the Respondent submitted a letter to the Arbitrator requesting that I, *"Withhold the issuance of an arbitration award until the Respondent, Utility, and P&A Construction, Inc. (P&A), exhaust their appeal to the United States Court of Appeals for the Third Circuit of the District of New Jersey Opinion and Order entered on February 18, 2020, denying Utility and P&A's application for a stay in tri-partite arbitration."*

On May 12, 2020, I responded to that request and referenced Federal Judge, Susan Wigenton's, decision in which she stated that the request for a

"*Harmony Arbitration is denied because no party to this litigation is a party to the Harmony Agreement.  She also determined that standing to invoke the dispute resolution procedures contained within the Harmony Agreement is limited to the parties to the Agreement (i.e., employers and individual local unions do not have such standing)."*  Accordingly, I denied the Motion to hold the matter in abeyance.

The record also reflects that four Subpoenas were issued in the instant matter.  The Respondent submitted two Subpoenas, one dated September 27, 2019, for James Stevens and one dated October 14, 2019, for Joseph Scarpone.  On October 23, 2019, the Petitioner submitted Subpoenas for Benedita Barros and Franciso Pinho, to appear at the arbitration hearing and offer testimony in the instant matter.

**ISSUE**

The issue as set forth and accepted by the parties was presented to the parties with my Notice of Hearing in the instant matter.  I framed the issue based on all of the information presented to me as follows:

Is the instant matter arbitrable?  If yes, did the Employer/Respondent violate the Work Preservation Clause and Hiring Hall provisions of the Agreement for work performed at the below listed work sites: 2017 Milling and Resurfacing Program for the Township of Woodbridge (see Exhibit U-6), 2016 Milling and Resurfacing Knopf Street, Lafayette Street, City of Linden (see Exhibit U7-A), Hiring Hall violation 2016 Milling and Resurfacing Knopf Street, Lafayette Street, City of Linden (see Exhibit U7-B), Hiring Hall

violation 2018 Roads and Sewer Improvement Project, City of Woodbridge (see

Exhibit U7-C).

Reference to the individual positions advanced by the parties in arguing

their issues will be found on Exhibit J-1 from the Petitioner on pages 13 and 14,

and for the Respondent it will be found in their post-hearing brief, page 4.

## RELEVANT CONTRACTUAL PROVISIONS

### IUOE LOCAL 825
### AGREEMENT

*THIS AGREEMENT shall bind all Subcontractors while working for an Employer at the job site who is a party to this Agreement.  Any Employer who sublets any of his work must sublet the same, subject to the terms and conditions of this Agreement.*
*The Employer agrees that he will not Subcontract any of his work, which is covered by the terms of this Collective Bargaining Agreement, to any Subcontractor, unless said Subcontractor agrees in writing to perform said work subject to all terms and conditions of this Agreement between the Employer and the Union.*
*The Employer retains full and exclusive authority for the management of his operations.  Except as expressly limited by the provisions of this Agreement, custom and past practices, the employer may direct his working forces at his sole prerogative, including hiring or discharge of his Employees.  The Employer may utilize any method or techniques of construction and there shall be no limitations or restrictions on the use of machinery, pre-cast materials, equipment, tools r other labor-saving devices, nor shall there be any limitations upon choice of material, equipment or design.  The Employer may assign and schedule work and shall determine when overtime will be worked and may require reasonable overtime.*

### ARTICLE I
### HIRING HALL PROCEDURE

*1.      The Union shall establish and maintain an open employment list for the employment of workmen.  Such list shall be established and maintained on a non-discriminatory basis, without regard to race, color, religion, sex or national origin, and shall not be based on, or in any way affected by union membership, by-laws, rules, regulations, constitutional provisions, or any other aspect or obligation or union membership, policies or requirements.*

2.   *Whenever desiring to employ workmen, the Employer shall call upon the Union for any workmen as the Employer may, from time to time need, and the Union shall refer such workmen from the open employment list.  The Employer shall give the Union twenty-four (24) hours' notice when requiring the services of a workman covered hereunder, said notice time to be exclusive of Saturday, Sunday and Holidays.*

   a)   *In notifying the Union of its need for workers, the Employer shall specify to the Union: (1) the number of workers required; (2) the location of the project; (3) the nature and type of construction involved, (4) the work to be performed and (5) such other information as may be necessary to enable the Union to make proper referral of applicants.*

   b)   *When an Employer states requirements for special skills or abilities in his request for Employees, the Union shall refer the first applicant on the register possessing such skills and abilities.*

3.   *The Employer shall retain the absolute and unconditional right to reject any workman referred by the Union not possessing the requisite work qualifications, or special skills and abilities, since the Union is not to be deemed to guarantee the same.  However, in no case shall a referred workman be rejected without just cause.  Any workman, who is rejected by the Employer with just cause, shall be restored to his place on the list.  The employer shall document the cause in writing.*

**<u>SUMMARY OF FACTS</u>**

The parties have submitted voluminous documentation to the Arbitrator in support of their positions.  The Petitioner submitted a pre-hearing arbitration brief, a reply brief and a post-hearing brief.  The Respondent submitted pre and post arbitration briefs outlining various positions, including specific court decisions in support of its argument that the Union's grievance should be denied. Both parties referenced the Harmony Agreement, which has within it BCTD (Building and Construction Trade Department), as well as USWA (United Steelworkers of America).  I also received documentation that there was reference to the Steelworkers as United Steelworkers and, in particular, Local 15024.  The rest of the facts in this case will be addressed in the positions of the

parties.  The way the parties argued their cases makes it a lot easier to use the manner in which they presented their cases in chief, as their specific positions. Going through those cases in chief to create a summary of facts is duplicitous, time consuming and costly to the parties.  I have taken verbatim, many of each party's submissions and incorporated them into my award due to the significance of each position and the impact on my award set forth below.

## POSITIONS OF THE PARTIES

### For the Petitioner

At the outset, the Petitioner contends, *"The Union is entitled to a decision in its favor on the grievances because the evidence in this matter will demonstrate that Utility Systems, Inc. violated both Article 1, paragraph 2 and the Work Preservation clause of the CBA."*  The Petitioner contends that the Respondent performed work on three separate projects in the Township of Woodbridge and on another project in the City of Linden and that these projects entailed work that was covered by the CBAs.  The Petitioner contends that Utility Systems utilized a subcontractor on the Linden project who performed covered work under the CBAs but that was in direct violation of the requirements of the CBAs because this subcontractor was not a signatory to any collective bargaining agreement with the Petitioner and had not agreed in writing to perform the work on that project subject to all terms and conditions of the CBAs between Utility Systems and the Union.

The CBA contains two discreet provisions that are directly at issue in this arbitration; Article 1, paragraphs 1, 2, and the Work Preservation clause.  Both are referenced above under the contractual provisions.

The Petitioner contends that the Respondent has breached these two provisions of the Agreement in connection with the work performed on the four separate projects listed below.

On or about April 6, 2016, Utility Systems entered into a contract with the Township of Woodbridge to perform milling, paving and resurfacing work on various roadways in Woodbridge.  Certified payroll records identify seven (7) employees who were not registered on the Petitioner's open enrollment list, were not dispatched to the 2016 Woodbridge project from the Union's open enrollment list but performed work on the 2016 Woodbridge project.  That work project is covered by the CBA between Utility Systems and the Respondent.  The use of those individuals resulted in a total of 206 separate hiring hall violations, which violated Article 1, paragraphs 1, 2 of the Agreement.  As a result of those breaches of the CBA, the Union has suffered damages that include the amount of wages that should have been paid to the members under the CBA, as well as benefit contributions.

On or about April 14, 2017, the Respondent entered into a second contract with the Township of Woodbridge to perform milling, paving and resurfacing on various roadways in Woodbridge. On this project, the Petitioner employed eleven (11) individuals who were not registered on the Union's open enrollment list, were not dispatched to the 2017 Woodbridge project from the

Union's open enrollment list but performed work on that project, which is covered by the CBA between the parties.  When all of the hours are added together, it shows that the Petitioner committed 212 separate hiring hall violations, which breached of Article 1, paragraph 1, 2 of the CBA.  As a result of those breaches of the CBA, the Union has suffered damages that include the amount of wages that should have been paid to the members under the CBA, as well as benefit contributions.

In or about the late spring or early summer of 2018, the Respondent entered into a third contract with the Township to resurface certain Township roadways (including storm water improvement, installing pavement, doing concrete curb and concrete sidewalk, as well as restoring driveways and landscaping).  There were seven (7) employees involved in this project, and the certified payroll records show that the Respondent committed forty-one (41) separate hiring hall violations, which breached of Article 1, paragraph 1, 2 of the CBA.  As a result of these breaches of the CBA, the Union has suffered damages that include the amount of wages that should have been paid to Union members under the CBA and benefit contributions.

Specifically, in or about the late spring or early summer of 2016, the Petitioner entered into a contract with the City of Linden to perform milling and resurfacing work on Knopf Street and Lafayette Street, as well as other streets. On that specific project, four (4) individuals were working on that project who were not registered on the Union's open enrollment list, were not dispatched to the 2016 Linden project from the Union's open enrollment list, but performed

work on the 2016 Linden project that is covered by the CBA between the parties. The use of those individuals on the 2016 Linden project resulted in a total of twenty-nine (29) separate hiring hall violations of Article 1, paragraph 1, 2 of the CBA.  As a result of these breaches of the CBA, the Union has suffered damages that include the amount of wages that should have been paid to the Union members under the CBA and benefits.

On that particular job site, the Respondent employed an entity known as Brasusa Construction to perform operator work on the 2016 Linden project that is covered by the CBA.  Thus, the Respondent's use of Brasusa as a subcontractor on the 2016 Linden project constitutes a breach of the work preservation clause of the Agreement.  Accordingly, the Union has suffered damages as a result of this breach and these damages, likewise, include the amount of wages that should have been paid to Union members under the CBA and benefit contributions.

The Petitioner contends that Article XXIV of the CBA sets forth a three-step grievance and arbitration procedure which applies to all questions or grievances involving the interpretation and application of the Agreement other than jurisdictional disputes which may arise between the parties. In response to the grievances submitted by the Petitioner, the Respondent asserted that it, along with an entity known as P&A Construction constitute a single employer and further asserted that P&A is a member of the United Steelworkers Union (USW) Local 15024.  Accordingly, the Respondent contends that the grievances are subject to a February 24, 1994, Harmony Agreement between the USW and its

affiliates in the building and construction trades department of the AFL-CIO (the BCTD) and its affiliates.

On October 10, 2018, Bruce Fickman, Esq., Associate General Counsel of the USW, sent an email to Victoria Bor, Esq. and Lucas Aubrey, Esq. of the law firm Sherman Dunn, P.C., which is general counsel to the BCTD. In that email, Mr. Fickman asserted that the grievances raising violations of Article 1, paragraph 1,2 of the CBA were based on work perform by P&A employing USW members.  Concomitantly, Mr. Fickman also asserted that the Union's pursuit of these grievances violates Section 5A of the Harmony Agreement.

On October 11, 2018, Ms. Bor responded and stated that the BCTD found that there was no basis for the USW's position.  Indeed, the BCTD found that there is nothing in the Harmony Agreement that precludes the Union from taking legal action to enforce its CBA.

Mr. Fickman replied to Ms. Bor and Mr. Aubrey requested that the BCTD send copies of the documents supporting Local 825's position that Utility Systems bid for and was awarded the project in question; and that Utility Systems filed certified payroll records showing it employed Operating Engineers to work on these projects.  In the attempt to reach a resolution of the matter, the parties met informally but there was no resolution.  Counsel for the Respondent asserted that Utility Systems and P&A are a single employer and he thus claimed that the Union's grievances are subject to the Harmony Agreement and its dispute resolution procedures, and it was his understanding that the USW would be presenting the matter.

On October 17, 2018, Mr. Aubrey sent an email on behalf of the BCTD, responding to Mr. Fickman's October 11, 2018, email.  In that email Mr. Aubrey attached to his October 17, 2018, email examples of documents supporting the Petitioner's position that Utility Systems was awarded and performed work on the projects in question, and that work on these projects was performed by operators.

On October 18, 2018, Mr. Fickman sent a letter to Mr. Aubrey in which he reiterated that P&A and Utility Systems are a single employer, and he then claimed, for the first time that since the 1980's the USW and Local 825 understood and accepted that the Employer would generally assign 80% of the Equipment Operators' work to USW represented workers under the USW CBA and 20% of the Equipment Operators' work to Local 825 represented workers under the Local 825 Agreement.  He also claimed that the 80/20 work sharing practice was in effect when the Harmony Agreement was executed in 1994. Finally, he asserted that Local 825's current efforts to change a long-standing 80/20 work sharing practice, with the USW's consent and over our objection, violates the Harmony Agreement.

The Union is entitled to a decision in its favor on the grievances because the evidence in this matter will demonstrate that Utility Systems violated both Article 1, paragraph 2 and the work preservation clause of the CBA. Furthermore, Utility Systems/Petitioner/Respondent has undeniably breached the requirements of the CBA.  It is undisputed that the Union and Utility Systems entered into a CBA and that the CBA was in effect when Utility Systems

performed the work on the Woodbridge and Linden projects.  The CBA is a valid contract between Local 825 and the Respondent.  The evidence in this matter will conclusively show that Utility Systems has failed to perform its obligations under Article 1, paragraph 2 of the CBA and under the work preservation clause of the CBA.

The certified payroll records and other evidence will demonstrate that Utility Systems subcontracted work on the 2016 Linden project to Brasusa.  The evidence will additionally demonstrate that Brasusa is not a signatory to any CBA with the Petitioner and that Brasusa did not agree in writing to perform the work on the 2016 Linden project subject to all terms and conditions of the CBA between the Petitioner and the Respondent.

Finally, the Union has suffered damages as a result of the Respondents breaches of Article 1, paragraph 2 and the work preservation clause of the CBA. The Union lost a total of 488 work days as a result of Utility Systems' violations, which in turn caused the Union to suffer damages that include the amount of wages that should have been paid to Union members under the CBA and benefit contributions.  The records and evidence will also show that the Union lost work as a result of Utility Systems' decision to subcontract work on the 2016 Linden project to Brasusa and as a consequence, the Union suffered damages.  These damages include the amount of wages that should have been paid to Union members under the CBA and benefit contributions.

The Petitioner contends that Utility Systems does not possess any viable defense to the Union's claims for breach of contract.  The Petitioner also argues

that the Harmony Agreement is irrelevant to the present matter and does not preclude the Union from enforcing the terms of the CBA pursuant to the Dispute Resolution Procedures of the CBA.  Even though Utility Systems may argue that the grievances are subject to the Harmony Agreement, it must be resolved through that Agreement's Dispute Resolution Procedure, the Petitioner rejects that argument as being without merit.  The Harmony Agreement serves a very specific purpose because it defines the relationship of the USW and the BCTD, as well as the organizing rights of each organization to each other's core jurisdiction.  However, the Harmony Agreement does not, in any way, state that the BCTDs' affiliates are barred from seeking to enforce the terms of their CBAs with their employers.  Thus, as Ms. Bore found on behalf of the BCTD, nothing in the Harmony Agreement precludes the trades from taking legal action to enforce their own CBAs.

Here, the Union was not – and is not – attempting to organize P&A. Rather, as the grievances plainly reveal, the Union is seeking to enforce the terms of Article 1, paragraph 2 of the work preservation clause of the CBA with Utility Systems.

Additionally, the Petitioner argues that the inapplicability of the Harmony Agreement's Dispute Resolution Procedures to this case is further confirmed by a reading of the Dispute Resolution Procedures themselves.  Section 7 of the Harmony Agreement details the procedures for resolving any dispute arising out of the interpretation or application of the Agreement or claims of violation of the Agreement.  Section 7A and 7B of that Agreement make clear that disputes

14

implicating the Harmony Agreement can only be raised by the USW and BCTD (not local unions or employers).

If one were to accept Utility Systems' argument that any disputes between it and the Union must be resolved through the Harmony Agreement's Dispute Resolution Procedures, then the Dispute Resolution Procedures contained with the CBA would be rendered meaningless. Such a result is nonsensical. Utility Systems' efforts to bring the grievances within the purview of the Harmony Agreement should be squelched firmly and without further ado.

The Union argues that Utility Systems' position that there was an 80/20 work sharing agreement and the Union is attempting to change that Agreement in violation of the Harmony Agreement is an interesting point, however, the Union did not have – and does not have – any knowledge of the alleged 80/20 agreement. The Union did not – and does not – have anything in writing showing or otherwise demonstrating that this arrangement even existed. Moreover, it must again be noted that neither the USW nor Utility Systems has produced any documentation showing that the 80/20 arrangement exists or any documentation showing that the Union previously understood and accepted that arrangement.

The Union strongly argues that if there ever was an 80/20 agreement between the Union and Utility Systems – again there was not – then that Agreement would have been memorialized in writing between the Union and Utility Systems that served as a bridge between that Agreement and the formal CBAs that they executed.

Even if an argument can be made that the Harmony Agreement is relevant to the present matter, the Union would still be entitled to recover the lost wages and benefit contributions.  Utility Systems has repeatedly admitted that as a single employer with P&A, and given these admissions, P&A is likewise bound to the CBA between the Union and Utility Systems and will be bound by any decision that is made in this Arbitration.

The Petitioner argues that the Respondent has not devoted a single word of its pre-arbitration brief to refuting the Union's claims that Utility Systems' breached these two provisions of the CBA.  Rather, Respondent focuses on a matter that, in the end, only serves to highlight the lack of merit to Respondent's position in this case.   Again, the Union argues that there is a phantom work sharing agreement between Local 825 and Local 15024.  Additionally, neither the USW nor Utility Systems has provided any documentation showing that the Union previously understood and accepted the arrangement despite the fact that the BCTD specifically requested that this documentation be produced.  The Union reached the conclusion that the failure to produce this information is not surprising because the 80/20 agreement simply does not exist.

The Union has the right to enforce the terms of its agreement with Utility Systems.  The Respondent argues that since on or about April 10, 2018, Petitioner has been exerting economic pressure on P&A/Utility and its Local 15024 Steelworkers in an effort to coerce P&A/Utility into ending their contractual relationship with Local 15024 and to force P&A/Utility to transfer work away from their employees who are members of Local 15024.

On September 10, 2018, Union Counsel sent an RFI to Utility Systems counsel that did not attempt to exert economic pressure or otherwise seek to claim jurisdiction over work.  Rather, this RFI was simply looking for information concerning the operation of both Utility Systems and P&A so that the Union could confirm whether or not Utility Systems was violating the terms of its CBA with the Union.  Again, the Petitioner rejects the argument set forth by the Respondent that there was an implication with the Harmony Agreement and that the action of the Union in the instant matter is in violation of the Harmony Agreement.

The question of whether this dispute is arbitrable is to be decided by the Arbitrator.  If there is clear and unmistakable evidence that the parties agreed to arbitrate that question, then any court must defer and allow the arbitrator to decide the question of arbitrability.  Here, there can be no mistake that the Union and Utility Systems clearly and unmistakably agreed that the Arbitrator has the power to decide the issue of arbitrability.  As the Step Three Grievance Procedure of Article XXIV of the CBA reveals, the Step Three Grievance Arbitration is subject to the rules and regulations of the New Jersey State Board of Mediation.  Critically, Rule 12:105-2.5(b) of the New Jersey State Board of Mediation's Arbitration Rules and Regulations expressly provides that should questions arise in connection with the arbitrability of a grievance, said question shall be determined by the Arbitrator as a threshold issue.

There is no basis upon which to order a tri-partite arbitration. Even though the Respondent is insisting that there should be a tri-partite arbitration, nothing has been presented to give credence and support to that position.

The Union contends that the Respondents proffered defense that an anecdotal work sharing agreement – which admittedly does not exist in writing – even if one for arguments sake accepts the claim, and such alleged handshake agreement was vitiated and/or suspended in later years when Utility entered into a written, signed CBA Local 825.  The Respondent's position is simply not credible, nor even a cognizable defense to its breaches of its CBA, and the consequences are now finally attached to those breaches.

Based on the evidence submitted by each party, the Union respectfully submits that the Arbitrator should find that Utility was party to a contract with Local 825, namely the 2014 and 2017 CCLE of New Jersey CBAs.  The terms and conditions of those contracts are clear and unambiguous and not subject to any genuine debate as to interpretation or application.  Those contracts obligate and require Utility to hire employees and employ operators to perform covered work on all of its construction projects exclusively through Local 825's Hiring Hall and open non-discriminatory open employment lists.

Utility was obligated to engage a subcontractor to perform any of the project work and was also obligated and required only to use a subcontractor that was a signatory and/or a party to a Local 825 CBA or one who expressly agreed prior to commencing any work to be bound by the terms and conditions of the Local 825 CBA.

The Union also argues that to the extent Utility has sought to rely upon alleged, unwritten, unexecuted work share agreement based upon the testimony of witness Joseph Scarpone and James Stevens, these witnesses do not support

the Utility's contention.  Additionally, Utility's principals, Barros and Phino, III testified that there was some handshake deal with no definite terms and completely discretionary with respect to changes.  The executed Negotiation and Authorization form which Utility only produced on the day of the hearing despite early demands for the information, clearly and unambiguously stated that Utility hereby recognized the CCLE of New Jersey to act as the exclusive representative for the purpose of collective bargaining with Operating Engineers Local 825.

The Petitioner contends that Local 825's damages are readily quantifiable from a simple review of the underlying certified payroll work that Utility and P&A submitted on the Woodbridge and Linden construction projects, all of which had been awarded to Utility, not P&A.  (See Exhibits U-5.1, 5.2, 5.3, 5.4).  The non-Local 825 operators and work hours have been tabulated and summarized in Exhibits U-18, U-19A, U-19B and U-20.  As set forth in Local 825's summary of Exhibits, also introduced into evidence, Utility is now responsible for monetary damages in a total amount of $363,613.53.  The damages for the public contract project are as follows:

      (a)  $144,524.38     2016 Woodbridge Project

      (b)  $173,279.86     2017 Woodbridge Project

      (c)  $  27,968.36     2018 Woodbridge Project

      (d)  $  17,840.93     2017 Linden Project

The  Petitioner respectfully requests that an award be issued ordering Utility to pay to Local 825 the full amount of $356,107.70 consisting of benefit

funds in the amount of $141,655.91 and lost wages in the amount of $214,451.79, which Utility failed to pay as a result of its breaches of its CBA with Local 825.

### For the Respondent

There is a substantial question as to whether P&A/Utility has agreed to arbitrate this dispute.  As an initial matter, P&A/Utility contests that it has agreed to arbitrate the current dispute and argues that the Arbitrator lacks jurisdiction to render a decision as to whether or not the parties agreed to litigate this dispute in Local 825's chosen forum or without Local 15024 present.  In order for an arbitrator to resolve the current dispute, the arbitrator will be required to render decisions concerning: (1) P&A/Utility's compliance with Local 825 and Local 15024's CBAs; (2) the collective bargaining agreement history between the parties and the work sharing agreement established between P&A/Utility and Local 825 in 1983; (3) whether Local 15024 is a necessary party to this arbitration; and (4) whether or not Local 825's conduct is prohibited by the Harmony Agreement.  P&A/Utility's position is that all of these issues must be resolved by the Arbitrator in order for this matter to reach a final resolution or provide inconsistent results.  However, P&A/Utility has not agreed to submit all of these issues to arbitration without the presence of Local 15024 in this matter. P&A/Utility firmly believe that this matter should be resolved through a tri-partite arbitration involving all three necessary parties.  As such, there is a threshold question as to whether or not the parties agreed to arbitrate all of the issues

presented here and that decision must be rendered by the state or federal courts and is outside the jurisdiction of the Arbitrator.

The Petitioner's brief essentially requests that the Arbitrator either ignore the jurisdictional dispute raised during the February 20, 2019, call or that the Arbitrator simply render decisions concerning the underlying issues without making a determination as to whether or not he has jurisdiction to render such decision.  The law is clear in this matter, and it does not permit the Arbitrator to render a decision as to all of the necessary questions at issue in this dispute and must submit this jurisdictional issue to the appropriate federal court for adjudication before the arbitration can proceed.  The proper result here would be for the Arbitrator to stay the current arbitration and instruct the parties to resolve this jurisdictional dispute in federal court.  Alternatively, P&A/Utility would be willing to proceed with the current arbitration if the parties were to turn it into a tri-partite arbitration that includes Local 15024.  This would allow the parties to resolve their on-going disputes without the possibility of conflicting arbitration awards being issued against P&A/Utility.

A tri-partite arbitration would prevent the possibility of inconsistent results. By that, the Respondent contends that it would be improper for the Arbitrator to proceed with this arbitration when there is a strong possibility that it could result in an arbitration award that would conflict with the arbitration award rendered in the pending arbitration between P&A/Utility and Local 15024, which concerns the same covered work.

The Respondent argues that in a case like this where an employer faces the possibility of being subjected to conflicting arbitration awards resulting from bipartite arbitrations, the courts have routinely required the parties to submit to tri-partite arbitrations to resolve the dispute and avoid inconsistent results.

The courts have acknowledged that blindly enforcing conflicting arbitration awards is disfavored, and disputes involving multiple unions should be resolved through tri-partite arbitrations involving all of the interested parties.  It is undisputed that P&A/Utility is currently involved in pending arbitrations with Local 825 and Local 15024 stemming from work that both Unions claim to be covered under the CBAs.

On page 29 of Local 825's moving brief, *"it fully acknowledges that P&A/Utility are bound by the provisions of Local 825's CBAs because of their admitted joint/single employer status.  Thus, it cannot be disputed that P&A/Utility are also bound by the provisions of Local 15024's CBA."*  As such, if the arbitration award issued in this matter finds that P&A/Utility's hiring practices and use of Local 15024 Steelworkers violates Local 825's CBA, then P&A/Utility will be forced to abruptly terminate or stop their compliance with their CBA and Local 15024, which will result in a breach of their CBAs with Local 15024.

If Local 15024 is not joined in this arbitration as a necessary party, then the possibility exists that the arbitrator in the pending arbitration with Local 15024 could issue a decision that P&A/Utility's failure to use the Steelworkers would be a breach of its CBA.  The ultimate result would be two conflicting arbitration awards that would be impossible for P&A/Utility to legally satisfy.

P&A/Utility submits that the Arbitrator does not have jurisdiction under Local 825's CBA to issue a decision as to whether or not P&A/Utility agreed to arbitrate a dispute concerning two separate CBAs, the Harmony Agreement and P&A's collective bargaining history with Local 825 and Local 15024.

The Respondent argues that P&A/Utility and Local 825's 35-year collective bargaining history cannot be ignored and/or set aside.  P&A has been a signatory to a CBA with the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union Local 15024 since 1972.  The Respondent argues that since 1981, Local 825 has begun to harass P&A concerning its use of Local 15024 Steelworkers on its projects in New Jersey.  In 1982, P&A began to engage in negotiations with Local 825 to resolve the dispute between the parties concerning P&A's use of Local 15024 Steelworkers within the jurisdiction of Local 825's CBA.  Those negotiations were primarily handled by Joseph Scarpone, the Business Representative and organizer for Local 825, and the late Richard Salsberg, then counsel for P&A.  Frank Barros testified that during the negotiations, Utility was created so that P&A could, through Utility, continue negotiating a settlement and eventually sign a CBA with Local 825 to resolve the dispute between the parties. Utility produced evidence in the form of a 1983 newspaper article that established that in February of 1983, while negotiations were still on-going, Local 825 Operators picketed P&A in East Hanover, New Jersey.  The 1983 picketing was covered by the local press and resulted in P&A taking Local 825 to State Court in an effort to restrain Local 825 Operators from disrupting its projects and

harassing its Local 15024 Steelworkers.  In 1983, P&A and Local 825 eventually reached an agreement, without a formal CBA having been signed pursuant to which Local 825 would stop harassing P&A over its use of Local 15024 Steelworkers in exchange for P&A agreeing to hire a few Local 825 Operators on its jobs through its newly formed entity, Utility.

The understanding between the parties was that P&A/Utility would continue to primarily use Local 15024 Steelworkers on their projects and that some of the operating work would be given to Local 825 Operators, when practical based on individual projects.  Based on this work sharing agreement, from 1983 through 1985, several Local 825 Operators began working for the newly formed Utility and in return, Local 825 ceased its harassment of P&A and its Local 15024 Steelworkers.  Eventually, in 1985, Utility signed a CBA with Local 825 and that time, Utility, P&A, and Local 825 had continued to abide by the work sharing agreement reached between the parties in 1983.  The parties have now established a thirty-five (35) year collective bargaining history, which demonstrates their acceptance and compliance with the work sharing agreement reached between the parties in 1983.

After 35 years, Local 825 denies the existence of the work sharing agreement.  While the Petitioner is currently attempting to deny the existence of the work sharing agreement between the parties, Frank Pinho III, and Benedita Barros' testimony that Local 825 ceased its harassment of P&A/Utility in 1983 is clear evidence that an agreement was reached, otherwise Local 825 would have continued to picket and harass P&A/Utility over its use of Local 15024

Steelworkers within its territory.  For example, Ms. Barros testified that Local 825 has audited Utility's records approximately every three years since the 1980s and has never raised any objection to Utility's use of P&A and its Local 15024 Steelworkers on its projects.  P&A/Utility have admitted that they are joint and single employers and that they are bound by the provisions set forth in the CBAs for Local 825 and Local 15024.  Nevertheless, despite the work sharing agreement and the parties' thirty-five (35) years of collective bargaining history, since on or about September 10, 2018, Local 825 has been exerting economic pressure on P&A/Utility and its Local 15024 Steelworkers in an effort to coerce P&A/Utility into ending their contractual relationship with Local 15024 and to force P&A/Utility to transfer work away from their employees that are members of Local 15024 to members of Local 825.

The grievances that were filed on October 3, 2018, and October 5, 2018, alleged that Utility violated the Hiring Hall and work preservation clause of its Associated Construction Contractors and Construction Labor Employers of New Jersey (ACC/CCLE of NJ) CBA by subcontracting work to P&A.  This constituted a unilateral change for Local 825 to the parties' long-standing work sharing agreement, which was established over thirty-five (35) years of collective bargaining.

Local 825 further alleged that Utility violated the Hiring Hall and subcontracting provisions of its CCLE CBA by subcontracting work to non-signatory Brasusa.  Local 825 admits that its claims against Utility were primarily based upon a review of Utility's certified payroll records for three public-entity

construction projects awarded to Utility by the Township of Woodbridge in the years 2016, 2017, 2018 and one other public-utility contract awarded to Utility by the City of Linden in 2016.  Local 825 did not consider the long-standing work sharing agreement between the parties and currently denies the existence of the Agreement altogether.

During the arbitration, Local 825 called the Utility President, Frank Pinho, III, who did not deny the written obligations contained in the CBA with Local 825, but claimed that it was modified by an oral agreement reached in 1983 that has continued to the present as evidenced by the pattern and practice of the parties. Ms. Barros testified that the work sharing agreement was reached between the parties in 1983 to resolve an on-going jurisdictional dispute between the parties. Specifically, Utility was created solely so that P&A/Utility could employ Local 825 workers on the jobs by the work sharing agreement without P&A signing a CBA with Local 825.

Business Agent, Joseph Scarpone, testified that he knew of an agreement reached in 1983 with P&A, Local 825 and Local 15024.  However, due to the significant passage of time, he was unable to identify the work sharing arrangement with Utility in particular.

The testimony of Utility's officers established that the work sharing agreement was a critical part of the relationship between the parties.  They further testified that all of P&A's operators are members of Local 15024 which was permitted practice established by the parties over the past thirty-five (35)

years.  As such, it was improper for Local 825 to modify the CBA by unilaterally terminating the work sharing agreement by denying its existence in 2018.

Accordingly, because Local 825's current position constitutes an improper unilateral change to the parties CBA, the Arbitrator should deny Local 825's claims that Utility violated their CBA by using P&A's Steelworkers on the Woodbridge and Linden projects.

The Respondent argues that the Union's claims are barred by the doctrine of laches and equitable estoppel. The Arbitrator should find that Local 825's thirty-five (35) years of silence concerning Utility's use of P&A's Steelworkers on all of its projects establishes a good reason for Utility to believe that Local 825 had abandoned its claim that Utility's use of P&A's Steelworkers constituted a breach of Local 825's CBA.  Additionally, since the work sharing agreement was established long before electronic data storage became standard in the industry, it is unreasonable to expect Utility to still have records from the 1980s in storage. Furthermore, the lapse in time made it difficult for Utility to locate employees with personal knowledge of the original agreement entered into by the parties in 1983. The Respondent respectfully requests that the Arbitrator deny Local 825's claims because they waived their right to assert their claims by failing to pursue them for over three decades.

The Respondent requests that a final decision should be held in abeyance until the Third Circuit rules on the P&A/Utility's appeal requesting a tri-partite arbitration.  In support of that position, the Respondent asserts that the courts have acknowledged that blindly enforcing conflicting arbitration awards is

disfavored, and disputes involving multiple unions should be resolved through tri-partite arbitrations involving all of the interested parties.

In conclusion, P&A/Utility submits that the Arbitrator should deny Local 825's claims to the extent they seek damages related to the use of Utility's use of P&A's Local 15024 Steelworkers on the 2016 Woodbridge project, the 2017 Woodbridge project, the 2018 Woodbridge project and the 2016 Linden project.

**DISCUSSION AND OPINION**

The unique facts of each case can and do control how a particular disputed action by an employer might be adjudicated if a claim is submitted to arbitration.  Under any set of facts, however, I am limited to and must draw any conclusions from the exhibits presented and testimony given at the arbitration hearing.

The proper standard in the matter at bar is clear and convincing proof and not the mere preponderance of evidence proof.  The thrust of the Respondent's argument in the instant matter is that the Harmony Agreement reached between USWA and BCTD on February 24, 1994, is controlling and must be adhered to. Rather than go through an analysis of the Employer's argument, the easiest way to address the Harmony Agreement is to refer to United States District Judge, Susan Wigenton.


The Respondent submitted a Motion to stay this arbitration and to compel tri-partite arbitration.

On February 20, 2020, Judge Wigenton denied the Respondent's request. In her order she refers to P&A/Utility as the Plaintiff because of the moving papers submitted by Ron Tobia, counsel for Respondent.  Page 5 of her award and at Footnote 7, Judge Wigenton stated, *"This request is denied, as no party to this litigation is a party to the Harmony Agreement. (See Harmony Agreement at 1, stating that the Agreement is between United Steelworkers of America, USW International's predecessor organization and Building and Construction Trades Department, NABTU's former name).  Furthermore, standing to invoke the Dispute Resolution Procedure contained within the Harmony Agreement is limited to the parties to the Agreement (i.e., employers and individual local unions do not have such standing)."*

Accordingly, Judge Wigenton's denial of the Respondent in this matter is grounded on the fact that the Harmony Agreement does not implicate P&A/Utility and/or IUOE Local 825.  Judge Wigenton's decision is clear and unambiguous to the instant matter.  Tri-partite arbitration has been denied, and it is my understanding that Judge Wigenton's decision was appealed to the Third Circuit, and the parties are awaiting either a briefing schedule and/or a determination from the Third Circuit.  Nevertheless, I will move forward with my Award on a bi-lateral arbitration.

For purposes of this Award, Utility acknowledges and concedes that it and P&A Construction constitute a single employer within the meaning of the law. The record reflects that P&A is a signatory contractor with the United

Steelworkers Local 15024, and Utility is a signatory to Local 825 and at all times throughout the hearings and in

the written documentation submitted to the Arbitrator, both are referred to as the Respondents.

The record also reflects that Utility subcontracted work to P&A, but P&A is not a signatory with IUOE Local 825.

The Respondent strongly asserts that the parties for thirty-five (35) years had reached an agreement on an 80/20 work sharing arrangement, where 80% of the work would be done by USW Local 15024, and 20% as needed would be done by IUOE Local 825. The Petitioner vehemently objected to that because they challenged the veracity of the statement made by the principals of P&A/Utility because they have no record of it.  In an attempt to show that, in fact, there was an 80/20 work sharing arrangement, the Respondent's called Joseph Scarpone, a former Local 825 Business Agent and James Stevens, a former P&A employee and also former Steelworkers Business Agent.  While Mr. Scarpone testified that he knew of an agreement reached in 1983 where P&A would use Local 825 Operators and Local 15024 Operators, he was unable to identify the work sharing arrangement with Utility in particular.  Mr. Stevens was also unable to confirm the exact work sharing arrangement at issue in this matter.

Therefore, I must follow through on the argument being raised that there was an 80/20 thirty-five (35) year old work arrangement and review the standards for a past practice.

Typically, a past practice is often used to implement a separate and enforceable condition of employment never touched upon at any point in the written agreement.  It is commonly referred to as the silent contract.  The practical administration of an agreement sometimes creates a mutually agreeable past practice.

An established past practice suggests, in action, what the parties to the written agreement intended by a word, a phrase, a clause and their conduct toward that word, phrase, clause, or it is a benefit/working condition not set forth in the Agreement but allowed through supervisory practice.  In order for a past practice to be binding, it must meet the following standards:

    (1) it must be unequivocal;

    (2) it must be regularly and uniformly granted;

    (3) it must be clearly enunciated, freely and openly allowed, and exist over a reasonable period of time;

    (4)  it must be accepted and acted upon by the parties themselves through their authorized agents in administering the written agreement;

    (5)  it must not vary the express provisions of the agreement.

The record is devoid of any documentation to support the existence of a past practice.  The testimony of Mr. Scarpone and Mr. Stevens did not elicit information that would create support for the position advanced by the Respondents.  Even though the principals of P&A/Utility testified that there was a

thirty-five (35) year work sharing arrangement, they did not produce any documentation to support such assertion.

As previously indicated, there was no proof offered that a past practice did in fact exist.  One way to look at whether or not a past practice existed is to reference the defensive argument raised by the Respondent that Utility has been audited approximately every three years since the 1980s, and Local 825 never raised any objection to the Utility's use of P&A (and its Local 15024 Steelworkers on its projects).  In support of that argument, the Respondent argues that IUOE Local 825 could not unilaterally change the 80/20 work sharing agreement without properly bargaining for the change in good faith as required by law.

The five standards set forth above for support of a past practice candidly do not exist in the instant matter.  Even though the principals of P&A/Utility say that there is a thirty-five (35) year old agreement, there was no testimony from the Petitioner that they in fact knew of the existence of an 80/20 work sharing agreement or, in fact, acknowledged and accepted it.

Standard No. 4 requires that the past practice has to be accepted and acted upon by the parties themselves through their authorized agents in administering the Agreement.  There was no proof that there was a mutual agreement.  It is a unilateral assertion from the principals of P&A/Utility, without any supportive documentation.  Accordingly, I have determined based on the record, that there is no past practice.  Having determined that the Harmony Agreement is set aside by Judge Wigenton's determination and that a past

practice does not exist, I now focus on whether or not the provisions of the Agreement as set forth above have been violated by the Respondent.

As has been determined by the United States Supreme Court, procedural arbitrability is to be resolved in arbitration and not in the courts.[1]  The United States Supreme Court's Enterprise Wheel doctrine limits the arbitrator's authority to interpret and apply the collective bargaining agreement.[2]  The court said, *"An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice.  He, of course, may look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, the courts have no choice but to refuse enforcement of the award."*

In spite of its terrific legal maneuvering, nothing was presented by the Respondent to offer acceptability and credence toward its position that P&A and Utility did not violate Article 1, paragraph 2 of the work preservation clause of the CBA.

For the foregoing reasons, and having duly heard the proofs and allegations of the parties, I Award the following:

---

[1] John Wiley and Sons v. Livingston, 376 U.S. 543, 55 LRRM 2769 (1964)
[2] Steelworkers v. Enterprise Wheel & Car Corp., 80 S.Ct. 1358, 46 LRRM 2423 (1960)

## <u>AWARD</u>

The grievances filed by the Petitioner on October 3/5, 2018, in the matter at bar are not procedurally defective, and as such, must be determined on their merits.  The Respondent, Utility Systems, Inc. violated both Article 1, paragraphs 1 and 2 and the work preservation clause of the CBA.  The monetary damages presented by the Petitioner in this matter are sustained and shall be paid by the Respondent as follows:

      a.     $144,524.34    -     2016 Woodbridge Project

      b.     $173,279.86    -     2017 Woodbridge Project

      c.     $ 27,968.36    -     2018 Woodbridge Project

      d.     $ 17,840.93    -     2016 Linden Project

**(See Exhibits U-18; U-19A; U-19B and U-20)**.

Payments shall be made within sixty (60) days of this Award.

Dated:  August 14, 2020

                                          _____
                                          Gerard G. Restaino, Arbitrator

State of Pennsylvania)

County of Wayne)   ss:

On this 14th day of August, 2020, before me personally came and appeared GERARD G. RESTAINO to me known to be the person who executed the foregoing Arbitration Award and he duly acknowledged to me that he executed the same.

_____

Deborah Ann Henneforth